UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| PATRICIA G. BARNES,<br>    Plaintiff,<br>  v.<br>KILOLO KIJAKAZI, Acting Commissioner of Social Security Administration, *et al.*,<br>    Defendants. | Case No. 3:18-cv-00199-MMD-WGC<br><br>ORDER |

**I.   SUMMARY**

*Pro se* Plaintiff Patricia Barnes sued Defendants Kilolo Kijakazi[1] and Jimmy Elkins—employees for the United States Social Security Administration ("SSA" or "Agency")—after she applied, but ultimately was not hired, for an attorney advisor position in Reno, Nevada. Before the Court now are Barnes's motion for summary judgment (ECF No. 251) and Defendants' motion for summary judgment (ECF No. 260) on Barnes's sole disparate-impact age discrimination claim under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA"). For the reasons explained below, the Court denies Barnes's motion and grants Defendants' motion.

**II.   BACKGROUND**

Unless otherwise noted, the following facts are undisputed.

**A.   Attorney Advisor Positions in the Reno Office of Hearing Operations**

At the time of the events giving rise to this action, the SSA was in the process of opening a new Office of Hearing Operations ("OHO") in Reno, Nevada. (ECF No. 256-1 at 1.) Defendant Jimmy Elkins was the Hearing Office Director ("HOD") for the new Reno

---

[1]Andrew Saul was the previous Commissioner of the United States Social Security Administration ("SSA"). Kilolo Kijakazi is the current Acting Commissioner of the SSA and thus the proper Defendant. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

OHO and, as such, was responsible for recruiting, interviewing, and selecting its first employees, including attorney advisors. (*Id.*) Because attorney advisor positions are statutorily listed in the "excepted service" (*i.e.*, excepted from competitive service requirements of the federal civil service laws), the SSA "grants its HODs with broad authority to set forth their recruitment and hiring practices."[2] (*Id.* at 2.) *See also* 5 C.F.R. §§ 213.3102(d) (listing "Attorneys" as within the excepted service), 302.102(a) ("[E]ach appointment, position change, and removal in the excepted service shall be made in accordance with any regulations or practices that the head of the agency concerned finds necessary."). In other words, Elkins and other HODs have broad discretion in deciding how to recruit "excepted" attorney advisors. (ECF Nos. 184 at 5, 222 at 5.)

Around June 2011, despite a lack of formal training on hiring and recruitment, Elkins began recruiting and hiring for five attorney advisor positions in the Reno OHO. (ECF Nos. 222 at 5, 251-3 at 1, 256-1 at 1-2.) Elkins did, however, receive informal "guidance" from an SSA regional manager on "best practices for attorney advisor recruitment" and access to an internal agency database housing resumes of previous job applicants from across the country. (ECF Nos. 256-1 at 2, 257 at 3-4.) Elkins declares that he contacted about 11 individuals through this internal resume database. (ECF No. 256-1 at 2.) Elkins also had an internal email sent to SSA employees, announcing open attorney advisor positions in the new Reno OHO, and instructing interested employees to submit their resumes to Elkins. (ECF Nos. 263-1 at 2, 263-2 at 2.) Overall, Elkins screened and interviewed at least seven SSA employees as potential internal hires. (ECF No. 256-1 at 3.)

---

[2] "[T]he 'civil service' consists of all appointive positions in the executive, judicial, and legislative branches of the Government of the United States, except positions in the uniformed forces." 5 U.S.C. § 2101. "The civil service is composed of the 'competitive service,' the 'excepted service,' and the 'senior Executive Service.'" *Commw. of Pa., Dep't of Public Welfare v. U.S. Dep't of Health & Human Servs.*, 80 F.3d 796, 807 (3d Cir. 1996) (citing 5 U.S.C. §§ 2102, 2103).

To recruit externally, Elkins advertised the five open positions with the Peace Corps Returned Volunteer Service ("RVS"), an alumni branch of the Peace Corps.[3] (ECF Nos. 256-1 at 2, 257 at 6-8.) Elkins chose to advertise the open positions with the RVS "because its members have a demonstrated interest and dedication to public service." (ECF No. 256-1 at 2.) At minimum, according to the job posting, the entry level for the open positions required an active state bar membership and a writing sample submission. (ECF No. 257 at 8, 11 ("All attorney positions in the Federal Government require Bar membership. Proof of membership in the Bar must indicate a current active membership. (No exceptions permitted to this requirement.)").) Elkins screened and interviewed at least three Peace Corps alumni for the five positions. (ECF No. 256-1 at 2.)

Around this time, Elkins also advertised the open attorney advisor positions with the online job board managed by the Career Development Office ("CDO") at the University of Nevada, Las Vegas William S. Boyd School of Law ("Boyd").[4] In addition to Boyd students and alumni, the CDO gives job board access to students and alumni of other ABA-accredited law schools, on the condition that those students or alumni complete a "reciprocity request." (ECF Nos. 260-1 at 2, 260-3 at 2-3.) To submit a job posting to Boyd's online job board, prospective employers must affirm they will comply with Boyd's nondiscrimination policy, which requires an observation of "the principle of equal opportunity" and "includes an affirmation that the prospective employer will not discriminate against applicants based on age." (ECF Nos. 260-1 at 2, 260-4 at 2, 260-5 at 3-4.) Boyd first implemented this nondiscrimination policy in late 2005. (ECF No. 260-1 at 2.) Elkins declares that he "requested that [Boyd's] Career Development Office direct

---

[3]In their answer to the Fourth Amended Complaint ("FAC"), Defendants admit that the SSA "lacks knowledge as to the exact method by which the Peace Corps RVS or [Boyd] disseminated the job posting to alumni." (ECF No. 222 at 6.)

[4]Elkins stated in his deposition that he did not call Boyd or otherwise follow up to see whether it had in fact advertised the SSA attorney advisor job posting. (ECF No. 251-3 at 8.) Defendants also admit that the SSA "lacks knowledge as to the exact method by which [Boyd] disseminated the job posting to alumni." (ECF No. 222 at 6.) However, Elkins stated that he "knew [Boyd] had obviously sent something out, since [Elkins] started getting resumes." (ECF No. 251-3 at 8.)

the posting to alumni" because he wanted to "attract applicants who (1) already resided in Nevada; (2) met the minimum qualification of a juris doctorate and bar license; and (3) had prior legal experience." (ECF No. 256-1 at 2-3.) Elkins screened and interviewed at least three Boyd alumni for the five positions. (*Id.* at 3.)

Soon thereafter, Barnes—over 40 years old at the time[5]—contacted the SSA's Center for Human Resources ("CHR") to inquire whether the soon-to-open Reno OHO was hiring attorneys. (ECF No. 222 at 4.) Elkins then contacted Barnes directly, described how to apply for an attorney advisor position, and told her that "she should apply promptly because the recruitment was closing." (*Id.*) Unlike the Boyd and Peace Corps RVS applicants, Elkins did not provide Barnes with a copy of the job posting for the open positions. (*Id.*) Nevertheless, Barnes submitted the following materials for Elkins's review: a cover letter, resume, law school transcript, proof of membership to the Pennsylvania bar, and an annotated article that appeared in a recent issue of the "Domestic Violence Report." (*Id.*) Elkins confirmed that Barnes met the minimum qualifications for the attorney advisor position (active bar membership, U.S. citizen). (*Id.*)

A few days later, Elkins began the interviewing and hiring process for the five attorney advisor positions, among other staff positions, and he finished hiring staff by late August. (*Id.* at 5.) During this process, Elkins interviewed 27 applicants for these five positions. (*Id.* at 6.) Elkins and his assistant interviewed Barnes for an attorney advisor position. (ECF Nos. 184 at 8, 222 at 8.) Based on Barnes's interview responses, Elkins thought that Barnes "came off as bored, uninterested" and "demonstrated a limited understanding of the attorney advisor position and of the mission of [the OHO], and was not as well-prepared as other applicants." (ECF No. 222 at 9-10.) Both Elkins and his assistant agreed that "[i]t was so obvious from the interview" that they would not select Barnes for an attorney advisor position. (ECF No. 251-3 at 20.) A couple weeks later, Elkins chose the top candidates to fill the open positions, made offers to those applicants,

---

[5]Defendants do not dispute that Barnes was over 40 years old and thus part of an ADEA-protected group. (*See generally* ECF Nos. 256, 260, 263.)

and informed Barnes that she had not been selected for any of the positions. (ECF Nos. 184 at 9, 222 at 9-10.) Defendants admit that "of the final selectees for the five attorney advisor positions, one was over the age of 40."[6] (ECF No. 222 at 6.)

After Barnes sent Elkins three emails asking why she was not selected, Elkins referred Barnes's correspondence to Ed Pilapil, a regional CHR specialist. (ECF Nos. 184 at 9, 222 at 10.) Barnes explained to Pilapil that she might have been the victim of age discrimination. (*Id.*) After Pilapil asked Elkins why Barnes had not been selected, Elkins explained that he had attributed her non-selection to her poor interview performance and lack of enthusiasm for the position. (ECF No. 222 at 10.) Barnes then asked Pilapil why the attorney advisor positions were not advertised publicly and nationally and requested the ages of the selected job candidates. (*Id.*) Pilapil declined to answer because such information was protected from disclosure and recommended that Barnes file a Freedom of Information Act request. (ECF Nos. 184 at 10, 222 at 11.)

Several years later, this suit followed.

**B.    Procedural History**

This case has a nonlinear procedural history, which the Court discussed at length in its May 2, 2022 order. (ECF No. 219 at 3-4.) The Court incorporates by reference these additional background facts. (*Id.*)

**III.   DISCUSSION**

Both motions for summary judgment address Barnes's sole remaining ADEA disparate-impact age discrimination claim. (ECF Nos. 251, 260.) The Court will thus address the parties' arguments as to the claim within the legal framework for considering an ADEA disparate-impact claim. For the reasons discussed below, the Court finds Defendants are entitled to summary judgment and grants Defendants' motion.

///

///

---

[6]In his declaration, Elkins states that he is "now aware that at least three [of all candidates he interviewed] were over the age of 40." (ECF No. 256-1 at 3.)

## A. ADEA Disparate-Impact Age Discrimination Claim

Barnes in gist argues that "[t]he SSA's recruitment [for attorney advisors] was essentially a screening process to exclude older workers by targeting two institutions with average populations well under the age of 40." (ECF No. 251 at 11.) Barnes alleges that despite the SSA's facially neutral recruitment and hiring practices for attorney advisor positions, Defendants violated the ADEA by advertising the positions with "two institutions having populations well under age 40"—practices that "had a disproportionate and adverse impact upon Barnes and job seekers aged 40 and over." (ECF No. 184 at 14-15.) In their motions, the parties dispute whether Defendant Elkins's discretionary decisions to (1) advertise the job posting internally with SSA employees and externally with Boyd and the Peace Corps RVS, (2) not provide the job posting to Barnes, and (3) ultimately not select Barnes amount to a prima facie case of disparate-impact age discrimination. (ECF Nos. 251 at 11-20, 260 at 9-11, 259 at 10-13, 263 at 5-7.)

### 1. Article III Standing

Defendants first raise Article III standing as a threshold issue, arguing that Barnes lacks standing to bring her ADEA disparate-impact claim because she has failed to make the requisite showing that each of the three elements for standing are satisfied. (ECF No. 260 at 7-9.) Defendants dispute whether Barnes suffered a redressable injury in fact because, they argue, she successfully applied, and was considered, for an attorney advisor position. (*Id.* at 8-9.) Barnes contends that because she "had less time to prepare her application" and could not access the online job posting available to other candidates, she had less knowledge about the positions and was therefore less prepared for the interview, leading to her non-selection for the position. (ECF No. 262 at 15.) The Court disagrees with Defendants and finds that Barnes has standing to bring her claim.

Three elements must be met to establish Article III standing. "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citations omitted). "The plaintiff, as

6

the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.* (citation omitted); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). To survive a summary judgment motion raising standing hurdles, the plaintiff "may not rest upon mere allegations or denials of h[er] pleading, but must set forth specific facts" by affidavit or other admissible evidence showing she has suffered an "injury in fact" as a result of the defendant's challenged conduct. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see also* Fed. R. Civ. P. 56(e); *Lujan*, 504 U.S. at 561.

Here, Barnes offers specific facts showing that Defendants' actions disadvantaged her, and that she has standing to bring her disparate-impact claim. In their answer to the FAC, Defendants admit the following facts as Barnes alleged, which, taken together, lend themselves to a finding of an injury in fact. After Barnes called the SSA to inquire about attorney advisor positions, Elkins contacted Barnes directly, described how to apply, and told her that "she should apply promptly because the recruitment was closing." (ECF No. 222 at 4.) Although Elkins had advertised the job posting with Boyd's online job board and the Peace Corps RVS, he never provided Barnes a copy of the job posting. (*Id.* at 4, 6.) Barnes nevertheless applied, with little time and information to prepare for the interview. (*Id.*) In total, Elkins interviewed 27 applicants for the five positions, and only one of the final selectees was over the age of 40. (*Id.* at 6.) Elkins interviewed Barnes, and he declined to offer Barnes a position, due in part to her lack of preparedness and enthusiasm for both the position and the Agency. (*Id.* at 9.) Ultimately, Barnes was not hired. (*Id.*) These specific facts suffice to establish an injury in fact alleged by Barnes, *i.e.*, Elkins's notification to some populations (but not to Barnes) about the open positions disadvantaged Barnes and led to her, and others like her, not being selected. Her injury is also "fairly traceable" to Defendants' challenged conduct and is "likely to be redressed by a favorable judicial decision" awarding her damages. *See Spokeo, Inc.*, 136 S. Ct. at 1547. Accordingly, the Court finds that Barnes has standing to bring her claim.

///

///

### 2. ADEA Disparate-Impact Age Discrimination

Disparate-impact claims are cognizable under the ADEA, though the Supreme Court has warned that "the scope of disparate-impact liability under ADEA is narrower than under Title VII."[7] *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 232, 240 (2005). "[T]he focus in a disparate impact case is usually 'on statistical disparities, rather than specific incidents, and on competing explanations for those disparities.'" *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir. 1990) (citing *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 987 (1988)). To establish a prima facie case under a disparate-impact theory of liability, "a plaintiff must demonstrate '(1) the occurrence of certain outwardly neutral employment practices, and (2) a significantly adverse or disproportionate impact on persons of a particular [age] produced by the employer's facially neutral acts or practices.'" *Katz v. Regents of Univ. of Cal.*, 229 F.3d 831, 835 (9th Cir. 2000) (quoting *Palmer v. United States*, 794 F.2d 534, 538 (9th Cir. 1986)) (alteration in original). "[T]he ultimate burden of proving that discrimination against a protected group has been caused by a specific employment practice remains with the plaintiff at all times."[8] *Watson*, 487 U.S. at 997.

"Identifying a specific [employment] practice is not a trivial burden" in disparate-impact cases; instead, "the requirement has bite." *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 100-01 (2008). When challenging an employer's practices, "it is not enough

---

[7]To the extent Barnes challenges Defendants' "neutral practice of committing employment decisions on the subjective discretion of supervisory employees," *Rose*, 902 F.2d at 1424, the Supreme Court has recognized that such "subjective or discretionary employment practices may be analyzed under the disparate impact approach in appropriate cases," *Watson*, 487 U.S. at 990-91.

[8]In her briefs, Barnes repeatedly and erroneously invokes the Title VII disparate-impact framework (*i.e.*, discrimination on the basis of race, color, religion, sex, or national origin—not age) to construe the parties' respective evidentiary burdens. (ECF Nos. 259 at 11, 14, 262 at 5.) Because Barnes's claim falls under the ADEA, not Title VII, Defendants need not "defend against liability by demonstrating that the [employment] practice is 'job related for the position in question and consistent with business necessity.'" *See Ricci v. DeStefano*, 557 U.S. 557, 578 (2009) (quoting 42 U.S.C. §§ 2000e-2(k)(1)(A)(ii), (C)).

to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact. Rather, the [plaintiff] is 'responsible for isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical disparities.'" *Smith*, 544 U.S. at 241 (quoting *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 656 (1989)) (emphasis in original); *see also Watson*, 487 U.S. at 994.

Once the plaintiff identifies a specific employment practice, she "must also demonstrate a causal connection between those specific employment practices and the asserted impact on those of a particular age." *Stockwell v. City & Cnty. of S.F.*, 749 F.3d 1107, 1114 (9th Cir. 2014) (citations omitted). Causation requires the plaintiff's demonstration of a "statistical disparity affecting members of the protected group," *id.* at 1115, that is, "substantial statistical evidence sufficient to raise an inference that the disparate impact fell upon employees of a protected age group," *Katz*, 229 F.3d at 836 (citing *Watson*, 487 U.S. at 994). *See also Rose*, 902 F.2d at 1424. "Absent such a group-based disparity, the claim fails, whether it is articulated by an individual or a class." *Stockwell*, 749 F.3d at 1115.

### a. Specific Employment Practice

In the FAC, Barnes's disparate-impact claim challenges Defendants' "unlawful use of hiring criteria" and "facially neutral policies relating to the recruitment, evaluation, selection, and hire of attorney advisor applicants [that] had a disproportionate impact upon Barnes and job seekers aged 40 and over." (ECF No. 184 at 14-15.) Specifically, Barnes identifies two employment practices giving rise to her disparate-impact claim: (1) the SSA's practice of giving hiring managers like Elkins "unfettered discretion" to recruit and hire candidates for attorney advisors and other excepted-service positions; and (2) Elkins's "recruitment for the [five] attorney advisor positions target[ing] two institutions having populations well under the age of 40." (*Id.* at 15.)

In their motion for summary judgment, Defendants first argue that Barnes's disparate-impact claim fails because she "has not identified a specific, facially neutral

9

employment practice of SSA that led to a disparate impact on people over 40." (ECF No. 260 at 10.) Defendants contend that the SSA's general discretionary hiring policies are too vague and general for Barnes to challenge under the ADEA because they result from federal regulations granting federal employees like Elkins broad discretion in hiring for excepted-service positions. (ECF No. 263 at 6.) *See also* 5 C.F.R. §§ 213.3102(d), 302.102(a). Barnes also fails to identify a specific employment practice, they argue, because Elkins's decision to recruit the way he did—targeting internal resumes, Boyd's job board, and the Peace Corps RVS—"was a one-time decision" to hire for the Reno office, which does not constitute a specific SSA policy.

The Court finds that Barnes, in challenging Elkins's recruitment decisions, has identified a specific employment practice for ADEA purposes. The Court agrees with Defendants that the SSA's overall discretionary hiring policy for excepted-service positions is a federal "generalized policy" that does not lend itself to disparate-impact liability. *See Smith*, 544 U.S. at 241; *see also* 5 C.F.R. §§ 213.3102(d), 302.102(a). But, contrary to Defendants' assertion, Barnes has sufficiently identified a specific employment practice through Elkins's recruitment decisions for the five attorney advisor positions, which Barnes alleges is the catalyst for a "screening process" to exclude workers over the age of 40. (ECF No. 251 at 11.) Defendants admit that Elkins (1) had broad discretion in recruitment and hiring decisions, (2) received little to no training on how to recruit and hire attorney advisors, and (3) decided to limit his recruitment search to previously vetted internal resumes and the job boards for Boyd and the Peace Corps RVS. (ECF Nos. 222 at 5, 256-1 at 2, 3.) And Defendants further admit that Elkins personally contacted Barnes and told her that "she should apply promptly because the recruitment was closing," yet did not provide Barnes a copy of the job posting. (ECF No. 222 at 4.) For these reasons, the Court finds that by "isolating and identifying" Elkins's actions, Barnes has identified a specific employment practice—recruitment and hiring based on Elkins' sole discretion—for ADEA purposes. *See Smith*, 544 U.S. at 241.

///

**b. Causation**

With a specific employment practice now identified, the Court next determines whether Barnes has established causation by offering "substantial statistical evidence sufficient to raise an inference that the disparate impact fell upon employees of a protected age group." *Katz*, 229 F.3d at 836 (citing *Watson*, 487 U.S. at 994). Barnes does not offer expert statistical testimony; instead, she offers statistics on the median ages of licensed attorneys in Nevada and nationwide, the median age of active Peace Corps volunteers, and Boyd's average age of enrollment. (ECF Nos. 251 at 15, 259 at 12.) Barnes also self-calculates the proportions of people over age 40 among (1) attorney advisors the SSA hired for the West Coast region in 2011,[9] (2) the candidates for the five Reno-based attorney advisor positions, and (3) the five individuals who were hired for these positions.[10] (ECF Nos. 251 at 15-16, 259 at 12.)

While statistical evidence need not be "framed in terms of any rigid mathematical formula," *Watson*, 487 U.S. at 994-95, the Court finds that Barnes's evidence is insufficient to raise an inference that the disparate impact of Elkins's actions "fell upon employees by virtue of their membership in a protected age group." *Katz*, 229 F.3d at 836 (citing *Rose*, 902 F.2d at 1424). To start, Barnes offers statistics on the median age of lawyers nationwide (47.1 years old in 2020 and 46.5 years old in 2021) and the average

---

[9]To support her statistics on the age breakdown of regional SSA attorney advisors, Barnes simply cites a link to the general SSA website for its "San Francisco Region," which serves Arizona, California, Nevada, Hawai'i, Guam, American Samoa, and the Northern Mariana Islands. (ECF No. 251 at 16 & n.44.) *See also* Social Security Administration, *San Francisco Region* (last visited Apr. 13, 2023), https://www.ssa.gov/sf/. This webpage shows none of Barnes's purported statistics.

[10]Barnes attaches to her motion statistical reports from the U.S. Bureau of Labor that track the demographics of (1) worker displacement from 2009 to 2011 (ECF No. 251-2 at 4-31) and (2) unemployment and labor displacement resulting from the 2007-2009 "Great Recession." (*Id.* at 32-49.) These statistics, however, do not disaggregate between workers under age 40 and those above age 40. Barnes does not rely upon these general statistics for her causation argument, and in any event, they are not "sufficient to raise an inference that the disparate impact fell upon employees of a protected age group." *Katz*, 229 F.3d at 836 (citation omitted).

age of licensed attorneys in Nevada (47 years old in 2011). (ECF No. 251-2 at 1, 50.) Barnes also provides statistics tracking the ages of the 27 applicants and the five candidates hired for the position. (ECF No. 251 at 15.) Barnes asserts that only two of the 27 applicants (including Barnes herself) were over age 40, and that the average age of the five hired candidates was 33.2 years old—an age significantly lower than the Nevada and national lawyer averages.[11] (ECF Nos. 251 at 15, 259 at 12.) Defendants admit the ages of the hired applicants ranged from 26 years old to 47 years old, and that the 47-year-old applicant hired was a Peace Corps alumnus. (ECF No. 222 at 7.)

At best, Barnes has shown that the average of the five hired candidates is about 13 years younger than the average age of lawyers in Nevada and nationwide. Barnes has established a mere correlation; she has not demonstrated a "direct nexus" between Elkins's discretionary employment actions and their disparate impact on applicants by virtue of their age. *See Katz*, 229 F.3d at 836.

More importantly, there exists several gaps and deficiencies in Barnes's statistical evidence. *See Watson*, 487 U.S. at 996 (noting that neither courts nor defendants are "obliged to assume that plaintiffs' statistical evidence is reliable"). Barnes's age statistics for Boyd students and Peace Corps volunteers—the two external institutions Elkins directly targeted—are insufficient because they offer an incomplete picture of the potential applicants in each institution. Barnes's statistics only show the average ages of Boyd *students enrolled* in 2011 (age 28) and the average age of "*current*" Peace Corps "volunteers and trainees" (age 25) around 2011. (ECF No. 251-2 at 2-3.) Critically, Barnes offers no statistical evidence as to the average ages of (1) Boyd or Peace Corps *alumni* or (2) other students and alumni from other ABA-accredited law schools who also have access to Boyd's online job board. As Defendants note, Elkins advertised the job posting with Boyd's online job board, which serves both Boyd students and alumni as well as students and alumni from other ABA-accredited law schools who complete a "reciprocity

---

[11]Defendants do not appear to dispute these statistics. (*See generally* ECF Nos. 256, 260, 263.)

request." (ECF No. 260-1 at 2.) The lack of statistical inclusion of Boyd alumni undermines Barnes's case because all attorney advisor positions in the federal government, including the SSA, require current active bar membership upon applying, with "[n]o exceptions permitted to this requirement." (ECF No. 257 at 8, 11.) As Defendants argue, Elkins likely did not target law students because they would not have been licensed to practice and thus minimally qualified when Elkins was recruiting.[12] (ECF No. 256 at 12.) Barnes cannot carry her burden of persuasion with only partial statistical evidence.

Finally, Barnes does not offer statistical evidence sufficiently addressing Elkins's decision to recruit internally for attorney advisors—efforts that successfully attracted at least one potential candidate. (ECF No. 222 at 6, 263-2 at 2.) Barnes alleges statistical age disparities among attorneys within the SSA itself, but she does not substantiate these claims with any statistical reports, expert testimony, or other admissible evidence that the Court can access or review. (ECF No. 251 at 16 & nn.44 & 45.)

In sum, because the ultimate burden of persuasion "remains with the plaintiff at all times," *Watson*, 487 U.S. at 997, Barnes's disparate-impact claim fails because she has not established the necessary causal link between Elkins's employment practice and its disparate impact on individuals over age 40. Accordingly, Defendants are entitled to summary judgment on Barnes's disparate-impact age discrimination claim. *See* Fed. R. Civ. P. 56(c)(1)(B); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) ("[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."); *see also Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 1990).

---

[12] Moreover, to submit a job posting to Boyd's online job board, prospective employers like Elkins must comply with its nondiscrimination policy, which encompasses age discrimination and was already in effect by 2011. (ECF Nos. 260-1 at 2, 260-4 at 2.)

The Court thus grants Defendants' motion for summary judgment [13] and denies Barnes' motion on her sole remaining claim.

IV.  **CONCLUSION**

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the issues before the Court.

It is therefore ordered that Plaintiff Patricia Barnes's motion for summary judgment (ECF No. 251) is denied.

It is further ordered that Defendants' motion for summary judgment (ECF No. 260) is granted.

The Clerk of Court is directed to enter judgment accordingly and close this case.

DATED THIS 19th Day of April 2023.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE

---

[13]Because Defendants are entitled to summary judgment as to disparate-impact liability, the Court need not reach their affirmative defense arguments. (ECF Nos. 222 at 20, 260 at 11-12, 263 at 7-8.) *See also Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 91 (2008) (recognizing that the ADEA codifies "five affirmative defenses") (quoting *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 122 (1985)).